**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>         **Plaintiff,** <br><br>     **v.** <br><br> JOHN STERLING MYERS, STERLING CAPITAL, LLC, AND STERLING CAPITAL MANAGEMENT, LLC, <br><br>         **Defendants.** | Case No. 1:26-cv-6696 <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against John Sterling Myers ("Myers"), Sterling Capital, LLC ("Sterling Capital"), and Sterling Capital Management, LLC ("SCM") (collectively, "Defendants"), and alleges as follows:

## SUMMARY OF THE ACTION

1. This case involves Defendants' misappropriation of investor money, falsification of investor account statements, and other misconduct while acting as investment advisers to a pooled investment vehicle, Sterling Capital Investments, LLC (the "Fund"). Myers began operating this so-called "premier" and "exclusive investment pool" in 2022, through Sterling Capital and SCM, and raised approximately $4 million from approximately 28 investors over several years. Unbeknownst to investors, Myers perpetually drained the pool through unsuccessful trading and personal spending. As of the end of 2025, Defendants had only repaid investors approximately $398,000, and over $3.6 million of investors' money was gone.

2.      From January 2022 through at least July 2025, Myers offered and sold limited liability interests in the Fund to family, friends, and other investors in approximately five states, including Illinois. Myers touted his prior experience as an investment banker on Wall Street and his purported personal success trading securities. Myers routinely assured investors the Fund had outperformed the S&P 500 and, accordingly, their individual interests had grown in value. But Myers lied to investors about, among other things, the Fund's historical and current performance and his use of investor money. In truth, Myers regularly lost money trading, and he misappropriated at least $1.8 million by diverting Fund assets to his personal financial accounts, through which he engaged in further unsuccessful trading and paid for various personal expenses.

3.      To hide investor losses and entice additional investments, Myers sent investors fabricated quarterly account statements depicting accumulated net gains and positive performance beyond that of the S&P 500. On an annual basis, the statements portrayed investment returns between 16% and 54% (depending on the specific investor), even though Myers often traded away or otherwise depleted investor contributions to the Fund in just a matter of days. Based on Myers' reported success operating the Fund, many investors made additional contributions to the Fund, and some investors recommended Myers to family or friends who afterwards invested in the Fund.

4.       Myers generated the sham account statements from internal spreadsheets he used to calculate the net asset value ("NAV") of the Fund and the capital account balances of investors. Myers inflated the NAV by, among other things, incorporating assets the Fund did not actually own, such as his father-in-law's home and retirement accounts. To offset his mounting

trading losses, Myers also inflated the NAV by recording his hypothetical future income as a million-dollar "asset" of the Fund, even though he had not earned any income for many years.

5.      Myers further concealed the Fund's actual results by failing to issue tax forms to investors, as required by the Fund's offering documents, to inform them of their distributive share of the Fund's losses. Instead, Myers claimed all trading losses on his own personal tax returns without making any disclosure to Fund investors.

6.      Myers failed to pay certain investors who requested the value of their Fund investments as reflected in their account statements, offering various excuses without disclosing that he misused and lost their money.

7.      Myers solely owned and controlled both Sterling Capital and SCM and, through these entities, directed all activities for the Fund.

8.      By committing the acts alleged in this Complaint, Defendants violated the antifraud provisions of the federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Sections 206(1), (2), and (4) of the Investment Advisers Act of 1940 ("Advisers Act") and Rule 206(4)-8 thereunder.

9.      There is a reasonable likelihood that, unless restrained and enjoined, Defendants will continue to violate these federal securities laws.

10.      Accordingly, the Commission brings this action against Defendants seeking: (a) injunctive relief; (b) disgorgement of ill-gotten gains; (c) pre-judgment interest on those ill-gotten gains; (d) civil penalties; and (e) all other equitable and ancillary relief to which the Court determines the Commission is entitled.

**JURISDICTION AND VENUE**

11.     The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] and Section 209 of the Advisers Act [15 U.S.C. § 80b-9].

12.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209(d), 209(e)(1), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1), and 80b-14].

13.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because the acts or transactions constituting the violations of the federal securities laws detailed herein occurred in this district and because, at all relevant times, Sterling Capital's and SCM's principal place of business was in Chicago, Illinois.

14.     Defendants operated the Fund from a home office at Myers' residence in Chicago, Illinois. Defendants also offered and sold the securities described herein to investors in the Northern District of Illinois.

15.     Defendants have, directly or indirectly, made use of means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

**DEFENDANTS**

16.     **John Sterling Myers**, age 41, is a resident of Chicago, Illinois. Myers has never been registered with the Commission as an investment adviser.

4

17.     **Sterling Capital, LLC** is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Sterling Capital purports to provide independent financial advisory and administrative services to affiliated investment companies. Myers is the founder, sole member, and registered agent of Sterling Capital. Sterling Capital has never been registered with the Commission as an investment adviser.

18.     **Sterling Capital Management, LLC** is an Illinois limited liability company with its principal place of business in Chicago, Illinois. SCM is the designated managing member of the Fund with responsibility for the Fund's investments. Myers is the founder, sole member, and registered agent of SCM. SCM has never been registered with the Commission as an investment adviser.

19.     At all relevant times, Defendants each acted as an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Defendants owed the Fund a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure of all material facts, as well as a duty to act in the Fund's best interests.

## RELATED ENTITY

20.     **Sterling Capital Investments, LLC**, the Fund, is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Myers is the founder and registered agent of the Fund.

## FACTUAL ALLEGATIONS

**A.     Myers' Background and Formation of Sterling Capital, SCM, and the Fund.**

21.     After obtaining an undergraduate business degree, Myers worked at an investment bank in New York City between 2007 and 2013, as an analyst and then associate, until he was terminated due to a reduction in workforce.

22.     After relocating to Chicago in 2013, Myers engaged in personal securities trading for his own benefit for several years, without any formal employment.

23.     Myers organized Sterling Capital under Illinois law in March 2019.

24.     After experiencing personal trading losses, Myers executed an operating agreement for Sterling Capital in January 2022. The agreement listed Myers as Sterling Capital's registered agent and sole member. The agreement further explained that the business purpose of Sterling Capital was to "provide independent financial advisory and administrative services to affiliated investment companies."

25.     In early 2022, Myers created a website for Sterling Capital in which Myers described his nascent business as a "private and exclusive investment pool," "premier capital pool," and "leader in asset management," with "a sterling record of achievement" and an "actively managed portfolio which utilizes a trading strategy that employs a variety of securities to achieve the desired goals of its clients."

26.     On Sterling Capital's website, Myers described himself as "Founder, CEO, and Portfolio Manager," referenced his "successful career as an investment banker on Wall Street," and represented that he led a "team of experts." Myers specifically identified two of his siblings in the roles of "Director of Operations" and "Chief Data Officer," even though neither sibling has ever had any role in Sterling Capital.

27.     In September 2022, Myers registered two additional entities under Illinois law, SCM and the Fund. Myers created SCM to serve as the Fund's nominal investment adviser for purposes of collecting fees.

28.     As described further below, Myers solicited investments in the Fund over several years, raising approximately $4 million from at least 28 investors in five different states between

January 2022 and at least July 2025. The Fund's investors included several of Myers' family members and friends, and many investors shared connections to Myers' original hometown. As a result of these familial and other personal ties, many investors were receptive to Myers' solicitation and predisposed to trust him.

**B.    The Fund's Offering Documents and Organizational Structure.**

29.    Defendants offered and sold limited liability interests in the Fund pursuant to offering documents prepared by Myers, including a detailed private placement memorandum ("PPM") and limited liability company agreement ("LLC Agreement"). The interests offered and sold by Defendants were "securities," as that term is defined in the Securities Act and the Exchange Act.

30.    The PPM identified Sterling Capital as the Fund's administrator, SCM as the Fund's Managing Member, and Myers as the "founder, Managing Member, and Chief Executive Officer of [SCM]." The PPM further stated: "In that capacity, Mr. Myers has primary responsibility in managing the Fund."

31.    The PPM and LLC Agreement explained to investors that their money would be pooled and used for the Fund's investment and operating activities, in which they would not exercise any control or authority. As set forth in the PPM, the likelihood that investors would realize income or gain "depend[ed] on the skill and expertise of the Managing Member," and thus Myers.

32.    The PPM and LLC Agreement explained to investors that Sterling Capital was responsible for, among other things, (a) preparing statements for Fund investors, (b) calculating the Fund's investment performance, and (c) processing redemption requests and other Fund paperwork.

33.     The PPM and LLC Agreement explained to investors that SCM was responsible for, among other things, (a) managing the Fund's assets and making investment decisions for the Fund, (b) calculating the Fund's NAV, and (c) handling tax matters for the Fund, including filing federal tax returns and issuing Schedule K-1s to investors reflecting their "distributive share of the Fund's items of income, gain, loss and deduction." The Fund's LLC Agreement authorized SCM to receive certain annualized fees, specifically a 2% management fee (based on non-managing members' capital account balances), plus a 20% incentive fee (based on the net profits of the Fund).

34.     Although the offering documents specified distinct duties and responsibilities for Sterling Capital and SCM with respect to the Fund's operation, both entities acted only through Myers, who did not maintain separate books and records for Sterling Capital and SCM.

35.     Sterling Capital, SCM, and the Fund were "intertwined," according to Myers' sworn testimony. He pictured himself "as being the entity of Sterling Capital LLC" and "picture[d] the outside investors as Sterling Capital Investments, LLC [the Fund]." Myers considered SCM to be "a dormant shell."

**C.     Myers Falsely Marketed the Fund to Prospective Investors as Successfully Outperforming the S&P 500.**

36.     The Fund's investment objective, according to the PPM, was "to maximize absolute returns" and "seek[] capital protection and appreciation primarily through opportunistic trading in publicly-traded securities," with "a primary focus in securities of index tracking exchange-traded fund derivatives."

37.     Myers created and distributed to numerous investors a summary marketing brochure for the Fund. The brochure explained the Fund's goal was "to outperform the S&P 500 by a significant multiple." As explained in the brochure, the Fund "makes money" in two

primary ways: (1) "[p]remium income from entering derivative spreads and selling puts and calls," and (2) "[s]hort-term trading profits from opportunistic 'swing trading' in mispriced securities."

38. Myers included a chart in the marketing brochure, which he updated from time to time, comparing the monthly performance of the Fund to the monthly performance of the S&P 500 and falsely stating that the Fund's performance exceeded the performance of the S&P 500. In fact, Myers misappropriated Fund assets for his own personal expenses, and Myers lost most of the rest of the Fund's assets through unsuccessful options trading.

39. For example, a brochure Myers sent to at least one investor dated December 2023, falsely represented that the Fund, abbreviated as "SCI," had outperformed the S&P 500 in 12 out of 15 months since inception and annually as follows:

## Monthly Performance

| 2022 | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SCI | - | - | - | - | - | - | - | - | - | 18.7% | 6.6% | 5.8% | 33.9% |
| S&P 500 | (5.3%) | (3.1%) | 3.6% | (8.8%) | 0.0% | (8.4%) | 9.1% | (4.2%) | (9.3%) | 8.0% | 5.4% | (5.9%) | (19.4%) |

| 2023 | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SCI | 10.2% | 1.9% | 10.7% | 1.7% | 2.7% | 6.9% | 2.9% | (1.8%) | (3.0%) | 1.8% | 2.5% | 4.9% | 35.7% |
| S&P 500 | 6.2% | (2.6%) | 3.5% | 1.5% | 0.2% | 6.5% | 3.1% | (1.8%) | (4.9%) | (2.2%) | 8.9% | 4.4% | 24.2% |

**D. Myers Falsely Reported Gains to Investors in Quarterly Account Statements, Based on Myers' Artificial Inflation of the Fund's NAV.**

40. Myers similarly reported glowing performance results to investors in fabricated account statements, causing many of them to invest additional money in the Fund.

41. From January 2023 through at least January 2025, Myers created and mailed or emailed quarterly account statements to Fund investors, which purported to show investors' capital account balances and investment returns for the quarter, year, and the "lifetime" of their

investments. Although the fictitious returns listed in the account statements varied among investors, their supposed individual annual gains ranged from 16% to 54%. The account statements also purported to show how the investors' returns compared to the S&P 500's returns for the same period.

42.     For example, Myers disseminated the following data in a quarterly report of an investor's "Statement of Capital Account" for the quarter ending December 31, 2024:

|  | Current Period | YTD | Lifetime |
|---|---|---|---|
| Beginning Balance | $500,723 | $274,750 | $0 |
| Additions | $0 | $165,000 | $395,000 |
| Withdrawals | $0 | $0 | $0 |
| Distributions | $0 | $0 | $0 |
| Net Gain/(Loss) | $10,203 | $71,176 | $115,926 |
| Ending Balance | $510,926 | $510,926 | $510,926 |
| Net Return | 2.0% | 19.5% | 73.8% |
| S&P Return | 2.1% | 23.3% | 64.0% |

43.     After being falsely told by Myers that their investments in the Fund were growing, many investors made additional investments in the Fund, as shown in the account statement in the paragraph above (additions of $165,000 in 2024). Many investors also recommended the Fund to their friends or family. Several investors in the Fund had relatives who became Fund investors.

44.     Myers based his bogus calculations of investor returns in large part on a fictitious Fund NAV. According to the LLC Agreement, the NAV was supposed to be based on the "Fair Market Value" of all "Company Property," which was defined as "all tangible and intangible property, including Investments, the Company owns from time to time," less the liabilities and expenses of the "Company" (i.e., the Fund). Nearly all the tangible assets of value that Myers

included in the Fund NAV, however, were not actually owned by the Fund, or even Sterling Capital or Myers himself, but rather belonged to Myers' father-in-law.

45.     Myers kept a record of the purported assets and liabilities of the Fund in a spreadsheet labeled "NAV" within an electronic workbook that included related spreadsheets he used to calculate Fund and investor-specific investment performance. In his NAV spreadsheet, Myers included his father-in-law's personal retirement accounts, primary residence, and an adjacent piece of land. These supposed Fund assets, collectively valued at approximately $1.2 million in most of Myers' quarterly NAV calculations, were all held in the name of Myers' father-in-law (or his trust) and subject to Myers' father-in-law's control. Myers' father-in-law never agreed to contribute his personal retirement accounts or real estate to the Fund. Myers' father-in-law had separately invested in the Fund, and his Fund account statements reflected only those separate contributions.

46.     Occasionally, Myers' father-in-law permitted Myers to execute trades on his behalf in one of his individually held accounts. In April 2024, Myers significantly depleted his father-in-law's largest retirement account through options trading, executing hundreds of trades and losing hundreds of thousands of dollars.

47.     Soon thereafter, to offset the negative impact these (and other) trading losses would have on how Myers was calculating the Fund's NAV, Myers began to include a new "asset" in his calculation of the Fund's value. Specifically, Myers added the purported value of Sterling Capital itself in his calculation of the value of the Fund, which had the effect of increasing the Fund's NAV by $1 million or more. According to Myers' sworn testimony, his valuation of Sterling Capital reflected the present value of earning $250,000 (Myers' estimate of his own earning potential) each year for the next 40 years. Myers recorded that amount as a Fund

11

asset, even though his estimated earnings were purely hypothetical and Myers had in fact earned no income for years.

48.     Myers never disclosed to investors that the Fund's NAV calculation incorporated assets the Fund did not own, or that the NAV was based in significant part on Myers' self-serving, wishful estimate of his own future income.

49.     Instead, Myers told some investors that the Fund held $10 million in assets when even his own NAV calculations were substantially lower and, in truth, the Fund never held anywhere near that amount.

### E.     Myers Routinely Lost Investor Money Trading Options.

50.     To invest in the Fund, investors typically wired or otherwise transferred money to a financial account held by Sterling Capital pursuant to Myers' instructions. Myers typically lost most or all such Fund investments within just a few days through speculative short-dated options trades.

51.      Sterling Capital's only brokerage account—and the only entity brokerage account Myers opened—was closed by the brokerage firm in or about March 2024 due to a pattern of third-party deposits, trading losses, and withdrawals.

52.     Thereafter, Myers used monies investors sent to Sterling Capital's bank account to finance trading in his own personal brokerage accounts. This trading, likewise, was consistently unprofitable.

53.     For example, on or about April 16, 2024, an investor executed a subscription agreement for an initial contribution to the Fund of $50,000 and wired this amount to Sterling Capital's bank account, which at the time held only $24.34. The next day, Myers transferred $40,000 from Sterling Capital's bank account to a brokerage account in his name and

immediately lost the funds in trading. Myers used the rest of the investor's money in the Sterling Capital bank account to repay a different investor $9,500 and transfer $500 to one of Myers' personal bank accounts.

54. Similarly, on or about June 24, 2024, an investor executed a subscription agreement for an initial contribution to the Fund of $100,000 and wired this amount to Sterling Capital's bank account, which at the time held only $25.71. The next day, Myers transferred $90,000 from Sterling Capital's bank account to a brokerage account in his name. Myers lost nearly this entire amount in trading over the next few days, resulting in a month-end balance of less than $160 in the brokerage account. Myers used the remaining $10,000 in the Sterling Capital bank account to repay a different investor $9,000 and transfer $1,000 to one of Myers' personal bank accounts.

55. On another occasion, in or about February 2025, an existing investor contributed an additional $100,000 to the Fund via check, which was made out to SCM. At the time, SCM did not have a bank account. So, Myers opened a new bank account in the name of SCM and deposited the check (dated February 12, 2025) on or about February 25, 2025. Over the next week, Myers caused SCM to transfer approximately $99,000 across three transactions to a bank account in his own name and Myers then transferred most of these funds to personal brokerage accounts in his own name, where the funds were consumed by trading losses. At the end of April 2025, after the transfers to Myers plus associated fees and a credit card payment, the newly opened SCM bank account had a zero balance and thereafter no additional account activity.

56. In some instances, investors granted Myers the authority to trade in their own personal brokerage accounts and transfer funds to Sterling Capital, and Myers similarly lost money trading options in the accounts of such investors. Certain of these investors also received

account statements and/or verbal updates representing that their Fund investments were generating positive returns.

57.     To conceal his trading losses from investors, Myers and SCM did not issue any Schedule K-1s to investors or file any tax returns for the Fund. Instead, Myers claimed the trading losses on personal tax returns he filed jointly with his wife. Per his own tax returns, for three consecutive years from 2022 to 2024, Myers had ever-increasing losses from options trading, including over $890,000 of reported deductible trading losses in 2023 and over $1 million of reported deductible trading losses in 2024.

58.     From the Fund's inception through March 2025, when Myers stopped updating the Fund's NAV, Myers recorded minimal or zero "asset" values in his NAV spreadsheet for various financial accounts held by Myers or Sterling Capital. In the NAV spreadsheet, Myers separately recorded his aggregate trading losses in those accounts as supposedly beneficial "tax assets" of the Fund in his calculation of the Fund's NAV, even though he claimed those losses on his personal tax returns.

59.     While Myers told some investors that he had invested his own capital in the Fund, in fact, Myers' purported contribution to the Fund was primarily just a self-serving bookkeeping entry—the recording of prior personal trading losses as positively valued "tax assets" in his NAV spreadsheet.

**F.  Myers Misused Offering Proceeds for Personal Use.**

60.     Myers did not open any financial accounts in the name of the Fund. Myers routed Fund offering proceeds to legal entities owned entirely by him (Sterling Capital and SCM) and then diverted a significant amount of the proceeds to his personal financial accounts, where Myers commingled investor money with money from other sources, such as personal loans and credit card cash advances. Myers used such commingled funds for unsuccessful options trading,

14

as described above, and to pay for personal expenses, including personal credit card debt and rent for his family residence.

61. For example, in October 2022, soon after the Fund's inception and Sterling Capital's receipt of investments totaling $110,000, Myers transferred approximately $105,000 from the Sterling Capital brokerage account to one of his personal bank accounts and used most of this money to pay his personal credit cards, personal loans, and other personal expenses.

62. Myers did not disclose to investors, nor were investors aware, that their investments in the Fund would be used to pay Myers' personal expenses.

63. In total, Myers misappropriated at least $1.8 million by causing Sterling Capital and SCM to transfer investor funds to personal brokerage and bank accounts that Myers controlled in his and/or his wife's name.

**G. Myers' Continued Efforts to Conceal the Fund's Losses from Investors.**

64. To further conceal that Myers had depleted investor funds through unsuccessful trading and personal spending, Myers selectively refused to satisfy investor withdrawal requests in 2025. When confronted with withdrawal requests from two Fund investors during the Spring of 2025, totaling approximately $560,000, Myers provided these investors with false excuses, including claiming that the Fund's assets had been frozen by virtue of the Commission's investigation. The reality was the Fund did not have the money to meet these withdrawals. Myers subsequently paid money to a smaller Fund investor in August of 2025, with proceeds from a loan from a family member. At no point did Myers disclose to investors that he could not repay them due to a lack of Fund assets.

65. From the Fund's inception through the end of 2025, Myers used a portion of investor funds, along with credit card cash advances, the few successful trades he made, and

loans he received, to make repayments to certain investors, totaling approximately $398,000. Most investors have not been repaid.

66.     As of the end of 2025, Sterling Capital and SCM financial accounts held less than $350.

## COUNT I
### Violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder
### (Against All Defendants)

67.     The Commission realleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

68.     Defendants, in connection with the purchase and sale of securities, by the use of the means and instruments of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly: (a) used and employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

69.     Defendants knowingly or with severe recklessness made the material misrepresentations and omissions and engaged in the fraudulent conduct and/or scheme described above.

70.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II
### Control Person Liability Under Exchange Act Section 20(a)
### (Against Myers)

71. The Commission realleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

72. As alleged herein, Sterling Capital and SCM violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

73. At all relevant times, Myers was a control person of Sterling Capital and SCM for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

74. At all relevant times, Myers participated in, and exercised control over, the operations of Sterling Capital and SCM, and also possessed the power and ability to control the acts constituting Sterling Capital and SCM's violations of the securities laws as alleged herein.

75. Accordingly, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Myers is jointly and severally liable with, and to the same extent as, Sterling Capital and SCM for their violations of the Exchange Act alleged herein.

## COUNT III
### Violations of Securities Act Section 17(a)
### (Against All Defendants)

76. The Commission realleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

77. By engaging in the conduct described above, Defendants, in the offer or sale of securities, by use of the means or instruments of interstate commerce or of the mails directly or indirectly have: (a) knowingly or severely recklessly employed devices, schemes and artifices to defraud; (b) knowingly, severely recklessly, or negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to

17

make the statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly, severely recklessly, or negligently engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon purchasers or prospective purchasers.

78. By reason of the foregoing, Defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1)-(3)].

## COUNT IV
### Violations of Advisers Act Section 206(1) and 206(2)
### (Against All Defendants)

79. The Commission realleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

80. While acting as investment advisers, through use of the mails or means or instrumentalities of interstate commerce, Defendants, directly or indirectly, singularly or in concert: (1) knowingly or severely recklessly employed devices, schemes, and artifices to defraud a client or clients or prospective clients; and (2) knowingly, severely recklessly, or negligently engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon a client or clients or prospective clients.

81. By reason of the foregoing, Defendants have violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

## COUNT V
### Violations of Advisers Act Section 206(4) and Rule 206(4)-8
### (Against All Defendants)

82. The Commission realleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

83.     The Fund is a "pooled investment vehicle" as defined by Advisers Act Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

84.     While acting as investment advisers, through use of the mails or means or instrumentalities of interstate commerce, Defendants, directly or indirectly, engaged in transactions, practices, and courses of business that were fraudulent, deceptive and manipulative with respect to investors or prospective investors in the Fund.

85.     Defendants: (a) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in the Fund; and (b) engaged in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative with respect to investors or prospective investors in the Fund.

86.     Defendants knowingly, severely recklessly, or negligently engaged in the conduct described above.

87.     As a result, Defendants have violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that this Court:

**I.**

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in

19

violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## II.

Enter an Order of Permanent Injunction restraining and enjoining Myers from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

## III.

Enter an Order of Permanent Injunction restraining and enjoining Myers from directly or indirectly acting as or being associated with any investment adviser, pursuant to Sections 21(d)(1) and 21(d)(5) of the Exchange Act, Section 20(b) of the Securities Act, and Section 209(d) of the Advisers Act. For purposes of this paragraph, a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser.

## IV.

Order the Defendants to disgorge, on a joint-and-several basis, their ill-gotten gains received as a result of the violations alleged in this Complaint, along with prejudgment interest, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (d)(5), and (d)(7)].

## V.

Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other relief as this Court deems appropriate.

## <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

Dated: June 5, 2026

Respectfully submitted,

By: */s/ Ashley E. Dalmau Holmes*
UNITED STATES SECURITIES
AND EXCHANGE COMMISSION
Michael Foster (FosterMi@sec.gov)
Ashley E. Dalmau Holmes (DalmauHolmesA@sec.gov)
Dee A. O'Hair (OhairD@sec.gov)
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Phone:          (312) 353-3790
Facsimile:      (312) 353-7398